## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| WHITEHOUSE & SCHAPIRO, L.L.C., | ) | NO. 1:22-CV-00844 |
| | ) | |
| PLAINTIFF, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| V. | ) | MAGISTRATE JUDGE WILLIAM H. |
| | ) | BAUGHMAN, JR. |
| OHIO MILLS CORP., ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |
| _____ | ) | |
| OHIO MILLS CORP., | ) | WHITEHOUSE & SCHAPIRO, LLC'S |
| | ) | MEMORANDUM IN SUPPORT OF |
| COUNTER-PLAINTIFF, | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT ON OHIO MILLS |
| V. | ) | CORP.'S COUNTERCLAIM |
| | ) | |
| WHITEHOUSE & SCHAPIRO, L.L.C., | ) | |
| | ) | |
| COUNTER-DEFENDANT. | ) | |
| | ) | |

## <u>INTRODUCTION</u>

The undisputed deposition testimony shows that Ohio Mills Corp. ("Ohio Mills," and collectively with Ronald Katz ("Katz"), the "Defendants") would generate invoices, input the price and quantity, send the invoices to Whitehouse & Schapiro, L.L.C. ("W&S"), and that W&S then would prepay those invoices prior to Ohio Mills shipping goods to W&S.  Ohio Mills now claims that it was underpaid because the price or quantity of goods it included in the invoices it created was understated.  Ohio Mills claims that the price of the goods actually was set by oral agreements between it and W&S that differed from the written price Ohio Mills itself inserted in its own invoices.  Even if the truth of this nonsensical allegation were to be assumed (and there is only the uncorroborated assertion of Katz to support it, and all written is evidence to the contrary), Ohio Mills cannot explain how the fact that W&S paid Ohio Mills the amounts in

01359115-4

Ohio Mills' invoices could give rise to causes of action of the kind alleged against W&S in the Counterclaim. There are no issues of material fact and W&S is entitled to summary judgment on Ohio Mill's Counterclaim as a matter of law.

## FACTUAL AND PROCEDURAL HISTORY

Beginning in 2010, W&S purchased used clothing collected by Ohio Mills from bins that serve as collection locations for donations. (Affidavit of Brian London ("London Aff." copy attached as Exhibit A, at ¶ 5.) Since 2013, those purchases were governed by a Purchase, Supply and Lease Agreement (the "Initial Purchase Agreement"). (London Aff. ¶ 6-7.) The Initial Purchase Agreement has been modified by written amendments signed by W&S and Ohio Mills on five occasions. (*Id*. at ¶ 9, 1, 12-13.) W&S also loaned money to Ohio Mills and entered into related lease agreements with it. (*Id*. at ¶ 5.)

As Ohio Mills fell behind in its payments to W&S for loans and lease obligations under the parties' agreements, it entered into an Agreement to Defer Certain Payments with W&S. (London Aff., ¶ 10.) In 2017, the parties also entered into a Forbearance Agreement. (*Id*. at ¶ 15.) Both the Agreement to Defer Certain Payments and the Forbearance Agreement contained jury waiver provisions. (*Id*.[1])

The terms of the Initial Purchase Agreement were incorporated by reference into all the parties' subsequent agreements. (London Aff. ¶ 15.) Several terms of the Initial Purchase Agreement are relevant to this dispute. Section 8 of the Initial Purchase Agreement states that **"[n]o amendment, modification or supplement of any provision of this Agreement shall be valid or effective unless made in writing and signed by a duly authorized officer of each**

---

[1] These provisions are discussed in more detail in W&S's Motion to Strike Defendants' Jury Demand, which is being filed contemporaneously with W&S's Motion for Summary Judgment.

**Party**." (London Aff.  Exhibit 1 at 7, emphasis added.)  Exhibit A of the Initial Purchase

Agreement provides a mechanism for determining pricing if the parties are unable to agree on a

price.  (*Id*. at 9.)  Section 9 of the Initial Purchase Agreement calls for application of Maryland

law to any dispute between the parties.  (*Id*. at 7.)

W&S filed a Complaint against Ohio Mills and Katz in April 2022, alleging claims for

breach of contract and fraud against Defendants.  (ECF #1.)  Defendants filed an Answer and

Counterclaim.  (ECF #9.)   The Counterclaim, which is asserted only by Ohio Mills, alleges three

causes of action.  The first is a claim that W&S breached the agreements by failing to pay

"market rates as required under the agreements." (Counterclaim ¶ 21.)  The second cause of

action alleges that W&S failed to pay unspecified invoices "at the rates agreed."  (*Id*. ¶ 25.)

Ohio Mills claims it is entitled to recover for these unspecified underpayments "be it breach,

civil theft, or fraud."   (*Id*. at ¶ 28.)  Ohio Mills' third cause of action claims that W&S conspired

with former employees of Ohio Mills who "allowed the  underpayments set forth herein to

continue."  (*Id*. at ¶ 31.)

W&S asked Ohio Mills to set forth the factual basis of its claims in Interrogatories.  Ohio

Mills responses failed to do.  (*See* Exhibit B at 3-5.[2])

---

[2] It must be noted that W&S also served Defendant with Requests for Production of Documents on August 9, 2022.  Defendants did not produce any documents until October 27, 2022, and did not produce then, and has never produced, any electronic mail messages or other broad categories of responsive documents.  Despite two conferences with the Court, a Court Order to produce responsive information by December 12, 2022, and the filing of a Motion to Compel, Defendants still have not produced any electronic mails messages.  (*See* ECF# 29, W&S's December 26, 2022 Motion to Compel (setting forth the basis of the parties' discovery dispute).)  The Motion to Compel remains pending.  Simply and unfortunately, Defendants have gotten away with failing to meaningfully respond to written discovery, without any consequences so far. As set forth in the Motion to Compel, Ohio Mills should be barred from relying on any documents or information not produced in response to discovery in opposing this Motion or otherwise.

Two depositions have been taken in this action.  The first was the deposition of Ohio Mills' outside bookkeeper, Matthew Beck.  ("Beck Depo." at 30-31, copies of cited pages attached as Exhibit C.[3])  Beck only started performing bookkeeping services for Ohio Mills in January 2022, just four months prior to W&S's filing of its Complaint in this case.  (*Id*. at 34.) Beck was not involved in the sale or pricing of Ohio Mills goods.  (*Id.* at 31-32.) Beck had no personal knowledge of Ohio Mills' account payables or receivables.  (*Id.* at 42-45.)  He never reviewed any of the agreements between Ohio Mills and W&S.  (*Id*. at 84-85.)  Instead, he created a spreadsheet[4] setting out Ohio Mills alleged damages based solely on Katz's representation that the rates in the invoices issued by Ohio Mills were wrong and that a flat 35 cent per pound rate actually was owed on certain invoices prepared by Ohio Mills and sent to W&S.  (*Id*. at 84-88, 110-14.)   He did not know whether the 35-cent per pound rate was the correct rate to which the parties actually agreed despite different rates in the Ohio Mills invoices, or not.  He testified that:

> Q    And is it right that you don't have any idea whether the standard rate and the rate that  should have been charged actually was 35 cents?
>
> A    I have no knowledge of that. I have no knowledge of the agreement. I have no knowledge of  the discussion. The only thing that I can testify to was Ron came to my office and he was adamant, really felt strongly it should have been 35 cents. I said, okay, well, let's call it the standard rate then. If it's 35 cents, this is what it would have been. I was trying to show the difference in the numbers.

In fact, Beck admitted that he had no knowledge of what amounts were owed to Ohio Mills by any of its customers:

> Q.    Okay.  So it is fair to say then you don't have personal knowledge about what is owed to Ohio Mills by its customers?

---

[3] A copy of the complete deposition and Exhibits is being filed with the Court."

[4] Exhibit D.

A.      I do not have that knowledge.  I could not tell you with any degree of accuracy whatsoever.

(Beck Dep. at 44-45).

 As Beck concluded:

I was not accusing anyone of anything or saying that Whitehouse & Schapiro owed money or didn't owe money. I just wanted to put together a visual representation of what I had in front of me. There were bills of lading put in front of me, and my understanding from Ron was that the rate was different than what it should have been. So based upon the information that was given, I put together a visual depiction of what I believe to be the case. As I said, it's not an indication that Whitehouse & Schapiro actually owes this money or doesn't owe this money. I put it together for discussion purposes.

(*Id*. at 84-85.)

Beck further testified that since he became Ohio Mills' bookkeeper, he actually was the one who prepared the invoices based on bills of lading provided to him by Ohio Mills:

Q:      Can you walk me through that process?  You said for Whitehouse & Schapiro you were asked to create invoices, and you did so from prepayment deposits?

A:      So basically Ronald will call me and say, I need to get an invoice out to Whitehouse & Schapiro, there's something happening.  A bill of lading would be provided to me through a Fax.com system.  So, yes, Fax.com, that would then appear in my e-mail.

I would then take the bill of lading and enter into QuickBooks, and occasionally Ron will tell me what the rate was for that, you know, 30 cents, 35 cents, whatever it was.  Then I would create the invoice, and I would e-mail it to Brian, I believe his name was Brian Funk over at Whitehouse & Schapiro.

If there's any question about the invoice, they would respond, you know, there's a rate change or there's something different.  Oftentimes they would need to see the bill of lading, so I would provide the invoice and the bill of lading.

(*Id.* at 42-43).  This testimony confirmed that the per pound purchase price in the Ohio Mills invoices were provided by Katz and Ohio Mills to Beck, who prepared the invoices to W&S reflecting these purchase price rates.  Beck further confirmed this fact:

Q.      Are you involved in any way in the pricing of goods by Ohio Mills?

A.    I am told what the price is as it related primarily to Whitehouse & Schapiro because I had to send an immediate invoice and I would be told the rate.

First there would be a bill of lading generated with the weight, and then Ronald would usually clarify what the rate is.  So I've got the weight and I've got the person to send the invoice to.  So that is what I did.

….

Q.    So you would get the rate from Ron?

A.    Right.  Because there were different rates and it was getting confusing. Sometimes there was a loose load rate, that would be a different rate, or sometimes they would tell me it's 35 cents one way and 30 cents the other way or something.

So occasionally we had misunderstandings.  I would send an invoice and somebody from Whitehouse & Schapiro would say, that's not the right amount. This is a different rate.  I'd talk with Ron, is there some other rate going on here? I'd reach back to Ron and he'd say, that's correct, we need to change that invoice. So I would do that.

(*Id.* at 78-79).

The second deposition was the deposition of Ronald Katz, the president of Ohio Mills.

("Katz Dep." at 7, copies of cited pages attached as Exhibit E.[5])  The Katz deposition was taken

for Katz individually as well as on behalf of Ohio Mills pursuant to Rule 30(b)(6).  (*Id.* at 7-8.)

Katz is the President of Ohio Mills and the person with the most knowledge of Ohio Mills'

counterclaims.  (*Id.* at 11, 29.[6])  Katz admitted in his testimony that the purchase price for goods

in invoices sent to W&S by Ohio Mills reflected the rates agreed to between Katz and W&S:

---

[5] A copy of the complete deposition transcript and exhibits is being filed with the Court.

[6] It is noteworthy that Katz testified that other than himself, Beck also had the most knowledge about the calculation of damages for the Counterclaim.  Yet Beck admitted he had no knowledge of such claims, and just prepared a spreadsheet based on Katz telling him to assume that W&S should have paid Ohio Mills at the rate of 35 cents per pound for all shipments.  (*See supra* at 5-6.)  Katz admitted in his own deposition that Katz is the one who told Beck the price to put into his calculations.  (Katz Dep. at 30.)

A.   I think for every invoice that Mr. Beck sent out, … I would tell him the rate that was agreed on between myself and Mr. London.  That was the rate that the invoice was charged at.

(Katz Dep. at 34).

Katz's deposition testimony reveals a number of facts material to the present Motion. First, Katz acknowledged receipt of a letter dated April 14, 2022,[7] sent by e-mail and Federal Express, from W&S's counsel, formally notifying Ohio Mills and Katz of the willful breach of the parties' Purchase, Supply, and Lease Agreement and demand for payment of amounts owed to W&S.  (*Id*. at 58.)  Katz admitted that it was only after he received this notice of default and payment demand that he raised a complaint with W&S about alleged underpayment of invoices. (*Id*.)  Second, Katz testified that the unit price inserted into Ohio Mills' invoices to W&S were provided by Katz based on his discussions with Mr. Schapiro or Mr. London.  (*Id*. at 60.)

Katz further acknowledged that the parties' transactions were governed by the Purchase, Supply and Lease Agreement, as amended by the Fifth Amendment to the Purchase, Supply and Lease Agreement.[8]  (Katz Dep. at 62-63.)  The Fifth Amendment included a provision, ¶ 4(b), specifically governing the purchase price to be paid by W&S for goods purchased from OM.  As set forth in that paragraph and the Exhibit B referenced there, the parties recognized "that the sale price of Credential Clothing W&S is able to achieve from time to time will fluctuate with the market conditions for such Goods …."  The Fifth Amendment therefore provided:  "OM and W&S agree to negotiate in good faith and to attempt to agree on the price for W&S to purchase

---

[7] A copy of the April 14, 2022 letter is Exhibit 6 to the Katz Transcript.

[8] A copy of the initial Purchase, Supply, and Lease Agreement is attached as Exhibit 36 to the Katz Deposition.  A copy of the Fifth Amendment to Purchase, Supply, and Lease Agreement is Exhibit 22 to the Katz Transcript.  Katz testified that both of these copies were true and accurate copies of the agreements he signed and that he intended to be bound by them when he signed them.  (Katz Dep. at 40-41, and 63.)

Goods from OM from time to time."  Fifth Amendment, Exhibit A.  Katz confirmed that the

provision in Exhibit A for what price would govern in the event the parties were unable to agree

on a purchase price was irrelevant, as Katz acknowledged that he and W&S "always agreed on

prices".  (Katz Dep. at 159.)

      Consistent with their agreement, Katz would have a discussion or exchange an email with

W&S about each proposed shipment of goods to agree on the purchase price.  One example is an

email exchange on June 30, 2021 which is Exhibit 11 to the Katz Deposition.  In Katz's email to

W&S, Katz advised W&S that he had 3 loads to ship to W&S that week, and he confirmed the

pricing of each load to which he and Mr. London had agreed:

      Nicaragua - .30/lbs.

      Chile/Mexico - .33/lbs.

      Guatemala - .32/lbs.

Katz confirmed in his deposition that was typical of how the companies worked together to agree

on purchase prices for each shipment.  (*Id.* at 98-100.)

      Another example of how Katz and W&S discussed and agreed on pricing for each load is

Exhibit 49 of the Katz Deposition, which is an email exchange on November 5, 2020, in which

Katz asked W&S to increase pricing to $.27 per pound and Mr. London responded that he was

willing to pay $.26 cents per pound for that week's shipment and $.27 per pound for the

following week.  Katz agreed to those prices, noting that "Bill was always fair when it came to

price."  Katz further noted:  "I CERTAINLY DON'T BEGRUDGE PEOPLE THAT TAKE THE

KIND OF RISKS THAT YOU AND BILL DO – MAKING A PROFIT."   Katz confirmed this

exchange in his deposition.  (*Id.* at 110-13.)

Katz further confirmed in his deposition that Ohio Mills prepared the invoices sent to W&S and W&S paid the invoices based on the prices Ohio Mills included in each invoice:

Q     What's the first document you send to Whitehouse & Schapiro for a sale?  Is it  a bill of lading?

A     The bill of lading and the invoice are attached together.  The bill of lading is for proving delivery.  The invoice is the charge for the value of the goods shipped.

Q     Who prepares the bill of lading and invoice?

A     For the last seven years prior to Mr. Beck taking over in 2022 was Ms. Sara Stettin.

Q     Okay.  The information in the bill of lading  and invoice, in terms of the weight and the price, came from Ohio Mills, correct?

A     The bill of lading is only proof of delivery. It signifies what was shipped and the quantity that was shipped.  The invoice is what deals with the money. Unit price, it takes the information off the bill of lading, what was shipped.  It gives it a unit price.  It calculates the value of the load based on the value shipped and the unit price for that.

Q     The unit price was provided by Ohio Mills Corporation for the invoice, correct?

A     It was provided by myself as president based on my conversations with Mr. Schapiro and Mr. London.

Q     Whitehouse & Schapiro would have their payments applied to the invoices, correct?

A     Yes.

(Katz Dep. 59-60.)

## **DISCUSSION**

### I.     **Legal Standard.**

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. A factual dispute is only genuine if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248. A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## II.    W&S is Entitled to Summary Judgment on Ohio Mills Claim in Count I for Failure to Pay "Market Rates."

Count I of the Counterclaim alleges that W&S breached the parties' agreements by failing to pay "market rates." (Counterclaim ¶ 21.) Market rates are alleged in the Counterclaim to be determined by the amount W&S paid to other third-party suppliers. (*Id*. at ¶ 22.)

In order to prevail on a claim for breach of contract, Ohio Mills has the burden to prove the existence of a contract, breach of that contract, and damages. *See, e.g., Almilaji v. JS Int'l, Inc.*, No. GJH-18-2435, 2021 U.S. Dist. LEXIS 102944,*9 (D. Md. June 1, 2021). The interpretation of a contract is a question of law for the Court. *BG/Twinbrook Metro Ltd. v. Wheeler*, 346 Md. 601, 697 A.2d 898, 911 (1997). To be enforceable, the evidence of an alleged oral agreement must be sufficiently clear and definitive that the terms of the agreement can be determined:

> The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354 (1950) (internal citations omitted).  If there is not sufficient evidence of a definitive oral agreement, summary judgment is appropriate. *See, e.g., Dolan v. McQuaide*, 215 Md. App. 24, 79 A.3d 394, 400 (Ct. App. 2013); *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43 (Ct. App. 2002). Moreover, where as here, a written agreement contains a clause that any modification must be in writing, the party asserting that the requirement for a written modification has the burden of showing that requirement has been waived.  *See, e.g., Freeman v. Stanbern Const. Co.*, 205 Md. 71, 106 A.2d 50, 55 (1954).

The Initial Purchase Agreement, as amended by the Fifth Amendment, establishes the terms by which W&S and Ohio Mills agreed on how the price of goods sold by Ohio Mills would be determined. (London Aff. Exhibit 1 at 9.) The parties agreed "to negotiate in good faith and to attempt to agree on the price for W&S to purchase Goods from OM from time to time." (*Id.*; Fifth Amendment, at ¶ 1.)  There is no reference to prices paid by W&S to other suppliers in this pricing agreement.  (*Id.*)  There is no "most favored nation clause" that would allow Ohio Mills to charge whatever the best price W&S pays to third parties for identical goods.  *Cf. Chesapeake Expl., LLC v. Catlett Quality Plumbing & Heating, Inc.*, No. 5:12-CV-188, 2012 U.S. Dist. LEXIS 156169, *13 (N.D. Ohio Oct. 30, 2012) ("Most-favored-nation clauses grant a contracting party the absolute right to receive a higher benefit if that benefit is given to another similarly situated party contracting with the same entity.").

As noted above, Katz consistently testified that there was no written agreement to modify the pricing of the goods.  (*See, e.g.,* Katz Dep. at 51-53.)  Nor does Katz's testimony create a material issue of fact that there was a sufficiently definite oral agreement to charge "market rates" based on what W&S paid other suppliers.  On the contrary, Katz testified  that he negotiated agreed prices with W&S, and these prices fluctuated with the market, as evidenced by the email exhibits to his deposition.  (*See supra* at 7-9.)  Ohio Mills has not met its burden to show to show that there is a material issue of fact that W&S breached any contract by failing to pay "market rates," and all material evidence is to the contrary.

### III.    W&S is Entitled to Summary Judgment on Ohio Mills' Claim in Count II for Failure to Pay "Agreed Rates."

Count II of the Counterclaim alleges that W&S failed to pay for goods "at the rates agreed."  (*Id*. at ¶ 25.[9])  Ohio Mills claims it is entitled to recover for these alleged underpayments "be it breach, civil theft, or fraud." (*Id*. at ¶ 28.)

Taking Ohio Mills potential theories of liability out of order, W&S is not aware of any Maryland cause of action for "civil theft."  To the extent that Ohio Mills reference to civil theft is considered a claim of conversion,[10] Maryland law does not recognize such a claim where the duties between the parties are contractual and the alleged conversion is the failure to pay an

---

[9] The "market rate" and "agreed upon rate" theories are at best inconsistent.  Ohio Mills was only entitled to charge one rate, the rate to which the parties mutually agreed.  The best evidence of that rate is of course the invoices contemporaneously prepared by Ohio Mills based on rates provided by Katz to the person preparing the invoice for Ohio Mills and paid by W&S.

[10] However, doing so would violate the rule that a party cannot amend its complaint and assert new theories in opposition to a motion for summary judgment.  *See, e.g., Jeffries v. United States*, 2010 U.S. Dist. LEXIS 30426, *4 (N.D. Ohio Mar. 30, 2010) (citing *Tucker v. Union of Needletrades, Indust. & Textile Employees*, 407 F.3d 784, 787-89 (6th Cir. 2005)).

amount owed by contract.  In Maryland conversion "is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 731 A.2d 957, 963 (1999) (quoting *Interstate Ins. Co. v. Logan*, 205 Md. 583, 109 A.2d 904, 907 (1954)). Contractual damages are not "personal property" and failure to perform a contract is not conversion.  "[F]ailure to perform on a contract does not amount to conversion."  *See Fink v. Pohlman*, 85 Md. App. 106, 582 A.2d 539, 543 (Ct. App. 1990) *see also Brand Iron, Inc. v. Koehring Co*., 595 F. Supp. 1037, 1040 (D. Md. 1984)  ("Failure by a contracting party to pay the contract price or debt, however, is not conversion but merely breach of contract.").

Turning to Ohio Mills reference to fraud, to prevail on a claim for fraud, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. Each of these elements must be proven by clear and convincing evidence.

*Gourdine v. Crews*, 405 Md. 722, 955 A.2d 769, 791 (2008) (cleaned up).

The only representation identified in Count II of the Counterclaim is the "representation" of the amount of the invoices.  But as Katz's deposition testimony clearly and unambiguously states, Ohio Mills, not W&S, prepared the invoices, and W&S prepaid the amounts that Ohio Mills stated to be due in the invoices, before the goods were even shipped.  (*See, e.g.,* Katz Dep at 59-60, 177-78 (testifying that it was W&S that relied on the invoices prepared by Ohio Mills, not the other way around).)  In the absence of any representation ***by*** W&S ***to*** Ohio Mills detrimentally relied upon ***by*** Ohio Mills, there can be no fraud claim as a matter of law.

Moreover, Ohio Mills and W&S are sophisticated commercial parties that were represented by counsel during the course of their relationship. The only duties between the parties arose by contract, and the only damages alleged as a result of the "fraud" (the alleged underpayment of the invoices) is the same as the claims for breach of contract. "It is not a tort to breach a contract, no matter how willful or malicious the breach." *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). "Where the duties imposed upon the parties are governed by contract, then contract law governs the recovery." *Clevenger v. Dillard's Dep't Stores*, No. 1:02-cv-558, 2007 U.S. Dist. LEXIS 73549, *81 (S.D. Ohio Oct. 2, 2007).

This leaves Ohio Mills' claim for "breach." Neither the Counterclaim, nor Ohio Mills written discovery responses (not that meaningful responses were ever provided) identify any specific agreement that was breached, let alone a specific clause or provision of any such agreement. Again, Ohio Mills has the burden of showing the existence of an agreement, breach, and resulting damages.

It is difficult to analyze Ohio Mill's breach of contract claim based on the limited and conflicting testimony provided. Beck's testimony at least was clear and consistent. He testified that he determined the alleged damages from the breach of contract based on the use of a uniform price of 35 cents per pound during the contested period. His sole basis for using this rate was that Katz told him to do so and to substitute that rate for the rates in the actual invoices sent to W&S by Ohio Mills. He had no personal knowledge of any amounts owed. (*See supra* at 4-6.)

Katz's testimony is impossible to reconcile. He testified that there were "oral agreements" to change the prices on a frequent basis. (Katz Dep. at 38, 204.) How this can be reconciled with the uniform rate he instructed Beck to use for Beck's calculation is not, and

cannot, be explained.  Indeed, it is Ohio Mills own invoices and accounting system that show changes in price and not the flat rate Katz claims was owed for the entire period at issue.  (*See* Exhibit D.)

Katz repeatedly testified that he relied on Beck to determine the existence of a breach and the amount of the alleged damages.  (*See, e.g.,* Katz Dep. 193-94.)  He also testified repeatedly that there were no written agreements amending or setting forth the price that would be paid for the goods.  (*Id.* at 51-53; 155-58; 201-202.)  Finally, he repeatedly testified that he was not involved in the preparation of the invoices, relied upon Ms. Stettin (an Ohio Mills employee) and later Beck to prepare invoices, and did not even see them before he they went out.  (Katz Dep. at 25-26, 38-39.[11])

Katz's testimony does not create a material issue of fact that the price or quantity of any specific invoice was incorrect, let alone that the prices and quantities were incorrect for the entire period claimed for which Ohio Mills seeks recovery in its Counterclaim.  Ohio Mills' invoices show the rate it contemporaneously charged W&S.  Its accounting system shows that rate.  Katz has admitted there is no contemporaneous written evidence of any dispute over the rate.  Ohio Mills' allegation that the price per pound in some invoices was incorrect did not arise until after Katz received W&S's notice of default and demand for payment shortly before the filing of the Complaint.  There is no basis for this allegation other than Katz's bald allegation, unsupported by any email or other document, that there was an oral agreement to pay a fixed 35-cent rate which is contradicted by the terms of the Initial Purchase Agreement as amended governing

---

[11] Katz's testimony establishes that Stettin has actual authority to issue the invoices, including the rate and quantity.  (Katz Dep. at 24-26, 59-62.)  Even absent actual authority, there is no question she had apparent authority to do so over the years long course of the parties' dealing. *Cf. Patriot Constr. v. Vk Elec. Servs.,* No. 942, 2023 Md. App. LEXIS 167, *18 (App. Mar. 2, 2023) (discussing apparent authority under Maryland law).

purchase prices, and also contradicted by the rates in the Ohio Mills invoices and bills of lading prepared by Ohio Mills and sent to W&S which W&S relied on to make payments before receiving the goods. Where, as here, the written contract documents and invoices are clear and unambiguous, Katz cannot create an in issue of material fact by asserting an oral agreement that is inconsistent with those terms. *Cf. Sagent Tech., Inc. v. Micros Sys.*, 276 F. Supp. 2d 464, 468 (D. Md. 2003) (granting summary judgment on breach of contract claim and holding that parol evidence could not be used to contradict written contract documents); *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 492 A.2d 1306, 1310 (1985) ("[W]hen the contractual language is clear and unambiguous, and in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract.").

Katz has not testified to the existence of a sufficiently definitive oral agreement to amend the terms of the written invoices issued by Ohio Mills, never mind the amount of damages that would have resulted from the alleged amendments.[12] It is undisputed that Ohio Mills prepared the invoices. W&S then prepaid Ohio Mills for the goods based on the invoices before any goods were shipped. W&S paid what it was billed. If anyone breached an agreement by including an incorrect rate or quantity in an invoice, it was Ohio Mills, not W&S.

---

[12] For purposes of summary judgment only, this is entirely leaving aside the estoppel, laches, and waiver defenses resulting from Ohio Mills' failure to timely identify and raise the alleged understatements in the invoices it issued. Again, Ohio Mills did not allege any such understatements until after W&S notified Ohio Mills it was in default. (Katz Dep. at 56-57.)

## IV.  W&S is Entitled to Summary Judgment on Ohio Mills' Claim III that there was a "Conspiracy" to Allow "Underpayments" to Continue.

Count III of Ohio Mills' Counterclaim alleges that there was a "conspiracy" between W&S and former employees of Ohio Mills to allow the underpayment of invoices set forth in Count II to continue.  (Counterclaim ¶ 31.)

Under Maryland law, civil conspiracy provides a means of holding a co-conspirator liable for acts committed in furtherance of the conspiracy by another member. *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 892 A.2d 479, 485 (Ct. App. 2006).  A civil conspiracy is (1) a combination of two or more persons, (2) by an agreement or understanding (3) to commit an unlawful act or use unlawful means to commit an act not otherwise unlawful, that (4) results in damages to the plaintiff.  *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276, 290 (Ct. App. 2005) (internal citation omitted).  However, the alleged conspiracy agreement itself is not actionable; instead, the underlying tort is considered to be the act which caused harm. As explicitly stated by the Maryland Court of Appeals, it is "improper pleading to allege . . . conspiracy in [a] separate count[]." *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 758 A.2d 95, 110 n.6 (Ct. App. 2000); *see also Allenco Inc. v. Jeanette Weinberg Found.* 340 Md. 176, 665 A.2d 1038, 1044-45 (Ct. App. 1994) ("The Statement . . . that civil conspiracy is recognized as an independent tort, is simply incorrect."); *Woods v. Stewart Title Guar. Co.*, No. CCB-06-0705, 2006 U.S. Dist. LEXIS 55767, *13 (D. Md. July 28, 2006) (collecting cases).

Even if Ohio Mills were not barred from attempting to replace Count III of the Counterclaim with a claim for fraud,[13] it would fail.  As set forth above, fraud requires an affirmative misrepresentation by a defendant that was relied upon by a plaintiff to its detriment.

---

[13] It is too late for Ohio Mills to attempt to amend its Counterclaim in an attempt to avoid summary judgment. *See supra* at 13, n. 11.

As set forth above, the allegedly "underpaid" invoices were prepared and issued by Ohio Mills and paid by W&S.  Ohio Mills has not alleged that it relied on any misrepresentation by W&S to its detriment.

## V. To the Extent that Ohio Mills Seeks Extra-Contractual Damages, W&S is Entitled to Summary Judgment on those Claims.

The substantive failure of Ohio Mills' causes of action bars it from recovering any damages.  However, even if any Ohio Mills' claims were to survive summary judgment, Ohio Mills cannot recover any of the extra-contractual damages referenced in the Counterclaim.

The Counterclaim does not explicitly seek punitive damages.  However, it does reference damages for "fraud."  (Counterclaim, Prayer for Relief at C.)  As discussed above, Ohio Mills' "fraud" damages are duplicative of its breach of contract damages.  Maryland law does not allow punitive damages for even a malicious breach of contract.  *See Munday v. Waste Mgmt. of N. Am.*, 997 F. Supp. 681, 685 (D. Md. 1998) (*citing St. Paul at Chase Corp. v. Mfrs. Life Ins. Co.*, 262 Md. 192, 278 A.2d 12 (1971)).  Even in cases of fraud, punitive damages are only available in cases where the fraud is malicious, which is rarely the case in commercial disputes where parties have an economic interest to protect.  *See, e.g., Postelle v. McWhite*, 115 Md. App. 721, 732, 694 A.2d 529 (Ct. App. 1997) ("Establishing actual malice in a commercial setting is particularly difficult because of the inherently competitive and aggressive nature of the business environment and the necessity to discern that conduct is motivated by malice rather than the result of a legitimate commercial controversy.");  *Marks v. Dann*, 600 F. App'x 81, 86 (4th Cir. 2015) (collecting cases under Maryland law).[14] The party claiming punitive damages has the

---

[14] Ohio law is the same. *Cf. Logsdon v. Graham Ford Co.*, 54 Ohio St. 2d 336, 340, 376 N.E.2d 1333 (1978) (holding that punitive damages could not be awarded where salesman knowingly sold used car as new because these actions "did not evidence a malicious, wanton or gross fraud"); *McEnteer v. Moss*, 9th Dist. Summit No. CIV.A. 22201, 2005-Ohio-2679, ¶ 9

burden of proving by clear and convincing evidence that it is entitled to such damages.  *See, e.g.,* *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, n601 A.2d 633, 657 (Ct. App. 1992).  Ohio Mills has provided no evidence of malicious conduct, let alone conduct sufficiently egregious to award punitive damages in a commercial dispute.  Therefore, to the extent there is any claim for punitive damages, that claim is barred as a matter of law.

The Counterclaim also seeks recovery of "[a]ny and all statutory damages." (Counterclaim, Prayer for Relief at C.)  Ohio Mills has not pleaded any statutory claim that would allow for recovery of statutory damages.

Finally, the Counterclaim seeks attorneys' fees.  Maryland follows the American Rule and does not allow for the recovery of attorney' fees except in certain limited, and not applicable, circumstances.  *See, e.g., Bainbridge St. Elmo Bethesda Apts., LLC v. White Flint Express Realty Grp. Ltd. P'Ship, LLLP*, 454 Md. 475, 164 A.3d 978, 984 (Ct. App. 2017).  Ohio Mills has not identified any contractual provision that would allow it to recover attorneys' fees.  And while attorneys' fees may be considered in awarding punitive damages (although they are not required), as set forth above Ohio Mills has not presented any evidence that would permit recovery of fees in this case.  *Cf. St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337, 568 A.2d 35 (1990) (discussing how counsel fees of prevailing party may be considered when punitive damages are awarded).

---

("Therefore, contrary to Mr. McEnteer's argument, the mere existence of fraud in this commercial transaction, even in falsified documents, is not enough on its own to support a punitive damages award."); *Guest v. Metker*, 5th Dist. Stark No. CA-7985, 1990 Ohio App. LEXIS 1752, *10 (Apr. 30, 1990) (an "arm's length transaction" is inconsistent with the "behavior necessary to ring the punitive damages bell").

## CONCLUSION

Ohio Mills' Counterclaim is nothing more than a thinly veiled attempt to gain leverage against W&S's legitimate claims to collect the substantial sums owed to W&S under the parties' agreements.  Because there are no disputes as to any facts material to the Counterclaim and as a matter of law W&S is entitled to summary judgment with respect to Counts I, II, and III of the Counterclaim, the Counterclaims should be dismissed.

Respectfully submitted,

/s/ Gregory R. Farkas
Mark L. Rodio          (0065134)
Gregory Farkas        (0069109)
FRANTZ WARD LLP
200 Public Square, Suite 3000
Cleveland, Ohio 44114
Telephone:     (216) 515-1660
Facsimile:      (216) 515-1650
mrodio@frantzward.com
gfarkas@frantzward.com

Irving E. Walker (*admitted pro hac vice*)
H.C. Jones (*admitted pro hac vice*)
COLE SCHOTZ P.C.
300 East Lombard Street, Suite 1450
Baltimore, MD 21202
Telephone:     (410) 230-0660
Facsimile:      (410) 230-0667
iwalker@coleschotz.com
hjones@coleschotz.com

*Attorneys for Plaintiff,*
*Whitehouse & Schapiro, L.L.C.*